LOTTINGER, Judge.
This matter is before us on an appeal taken by the defendants from a judgment awarding the plaintiff damages arising out of an automobile accident which occurred on June 24, 1957 near the corporate limits of St. Martinville, Louisiana. Liability having been admitted in the court below the only question presented by the appeal is that of quantum. The Lower Court awarded $6,000 for pain and suffering, $2,-000 for loss of earnings and $246 for medical expenses. The plaintiff answered the appeal.
The plaintiff testified that he was 36 years of age, married and the father of two children. His occupation, he stated, is that of carpenter’s helper. After the accident he was pulled from the pick-up truck by Jasper Stewart and was taken to the hospital in St. Martinville. He stated that his ear was sutured by Dr. Corne, that he was given some shots and also that an apparatus was given him to use on his neck which he used 2 or 3 times a day. He went home immediately after the accident and stayed in bed for two or three months. During this period his neck hurt him, he could not move it and he had to take aspirin twice a day to relieve the pain. The plaintiff further stated that some 14 stitches were taken in his ear and that for a month or two following the accident he visited Dr. Corne 3 or 4 times a week. He would be given shots and at the same time the weight would be applied to the neck.
He stated that his wages as an employee of Mr. Horace Rickey were $1.30 per hour, and that he had been working as a carpenter’s helper for about two years previous to the accident. He stated that he had pain at all times in the neck and that it hurt him at night to the extent that it would awaken him. He stated that he suffered from headaches and had to take Anacin in order to sleep. He testified that he had attempted light work around the house and in helping his father around the yard but that his neck hurt him when he did it. He stated that he still administered treatment to himself at home by use of the weight apparatus and that he could not perform the hard work required of a carpenter’s helper.
On cross examination the plaintiff stated that previous to being employed as a carpenter’s helper he had worked as a roustabout in a small refinery and before that he had farmed. He stated that his earnings as a carpenter’s helper amounted to $53 a week. He stated that at the present time he was training a racehorse and he owned it in partnership with another person. His duties in this regard consisted of feeding the horse and timing him. He stated that he was still using his head halter Dr. Corne prescribed once a day or once every other day. He testified that he had helped his father on his farm a little bit, *870 this work consisting of maybe a half hour’s work driving the tractor.
Leed Guidry, testifying on behalf of the plaintiff, stated that after the accident the plaintiff was down on the floor of the truck with one Jasper Stewart on top of him. When he got a good look at the plaintiff, he saw that his ear was almost cut off completely. He stated that following the accident the plaintiff was confined to bed for 3 or 4 weeks during which time he could hardly move. He stated that he used a pulley and a weight 3 or 4 times a day for about 3 or 4 months. He testified that he had been employed by Horace Rickey as a carpenter for the past 11 years and that Patin had been on the job since the year 1956.
It was stipulated that the testimony of one Jasper Stewart would be substantially the same as that of Guidry.
Dr. A. R. Corne, testifying on behalf of the plaintiff, stated that he had treated him on June 24, 1957 for an extensive laceration of the ear and ligamentous injury to the cervical region. In addition to the foregoing, he also found general contusions of the body which he termed moderate. Pie stated that he did not recommend that he remain in bed for two or three months but was certain that he did recommend at least a period of one week because of the serious laceration of the ear. He examined the plaintiff again on June 26th at which time he thought the neck injury to be a minor contusion of the ligamentous structures. He was not as concerned about the neck as he was about the ear because the plaintiff had suffered a ■very, very deep laceration which had almost completely removed his ear. As of June 29 he found considerable limitation of motion in the neck and thought that he was experiencing a lot of severe pain from the neck injury. On July 1 he administered a diathermy treatment to his neck and at a later date prescribed a neck halter and administered infra-red treatment. He stated that the healing of the ear was complete after 6 or 8 weeks and that some scars were left. The diathermy treatments continued through July and part of August and in August he began administering traction with infra-red applications. The doctor continued to prescribe and administer physio-therapy throughout August, September, October, December, the last treatment having been given on January 28, 1958. These treatments included both traction and diathermy and were given approximately once a week. The doctor recalled a limitation of movement in the neck and also spasm. The doctor stated that in the early stages of treatment he thought Patin was suffering considerable pain, but that later on he did not think he was in acute distress although his neck was “bothering” him. Although the doctor’s last treatment was in January of 1958, he stated that subsequently the plaintiff came in for a check up at which time he thought he had made considerable progress and in spite of the fact that there was some residual, advised him to return to work in an effort to secure the beneficial effects of activity. While the doctor did not know the exact date, he thought this to have been in the early part of 1958. By letter dated February 22, 1958 the doctor expressed the opinion that while Patin was handicapped by his injury, he felt he should be encouraged to resume some activities as a rehabilitation measure. He testified that he thought he was partially disabled prior to February 22, 1958, and that he would not have been able to hold a job requiring physical exertion of extent. Occipital headaches he stated were common in connection with injuries such as were suffered by Patin.
On cross examination the doctor stated that the plaintiff had suffered no residual from the ear injury and that the remaining scar was where the ear joins the skull. On the occasion of his examination in January, 1958, the doctor said that he found a limitation of motion to the neck which he termed a “handicap” rather than a disabling condition. This, he thought, would be a *871 handicap to one engaged as a carpenter’s helper although he thought that the plaintiff probably could resume farming activities.
The deposition of Dr. James Gilly, orthopedist, was taken on December 1, 1958 on behalf of the plaintiff. He first examined plaintiff on July 29, 1957, at which time he complained of pain on the side of the neck, particularly with rotation and extension of the neck. He found little or no muscular spasm in the neck but marked restriction of motion of about 70% in all directions. The doctor had X-rays taken and reviewed these together with X-rays taken on June 29 and found a peculiar configuration in relationship between the 2nd and 3rd cervical vertebrae with the 2nd cervical vertebrae displaced slightly forward. He thought this forward displacement was possible through a fracture of one of the posterior elements of the 2nd cervical vertebrae and that the fracture was the result of the accident. In other words, he believed that the fracture of the posterior element of the 2nd cervical vertebrae permitted a forward slipping of the 2nd cervical over the 3rd.
The doctor thought that for 2 or 3 weeks following the accident the plaintiff had rather severe pain and following that period with limitation of movement he probably had moderate pain but, if he exceeded moderate limitation of motion he would then have severe pain. He thought that the plaintiff on July 29th was disabled from performing his ordinary duties. He examined him again on October 28, 1957 and reported on November 19, 1957.
This examination showed no muscle spasm, limitation of left rotation and left flexion at 20%, right rotation and right flexion at 30% with extension of the neck normal. He thought at that time there would be a 20% to 30% residual disability accompanied by pain. He thought the man still disabled and recommended further observation for a period of 45 to 60 days. He described his pain at that time as being moderate and stated that it could be exaggerated upon activity. He stated that occipital headaches were usual for patients who had suffered this type of injury. He again examined the plaintiff on November 5, 1958. At this time he found mild muscle spasm with loss of flexion of the neck estimated at 5%. He reviewed the films which had been made by Dr. Meuleman and stated that they indicated a complete healing of the fracture noted previously. He estimated a residual disability of 15% in loss of function of the neck which he thought would be permanent.
On cross examination the doctor reiterated that in his opinion the plaintiff had suffered a 15% permanent loss of function of the neck. This, he stated, he did not believe to be a serious disability to one engaged as a carpenter or a carpenter’s helper.
The deposition of Dr. William Louis Meuleman, orthopedist, was taken on December 1, 1958 at the instance of defendants.
He testified that he saw the plaintiff on three occasions, namely, April 1, 1958, June 10, 1958, and November 12, 1958. As the result of an error, no report was made of the first examination. On June 10 another full and complete examination was given. At that time the plaintiff complained of a constant pain on both sides of the neck with a pulling sensation going up to the base of the skull. The pain was such that it kept him from sleeping. X-rays taken in October of 1957 and in April of 1958 showed a rotary subluxation between the second and third cervical vertebrae. This same situation showed in film studies made in October 1958. The doctors report of his June 10, 1958 examination was as follows:
“From a clinical standpoint, the patient shows a paucity of evidence to suggest any serious condition of the neck. It was on two occasions that the patient was seen with no muscle spasms or apparent restriction of motion. Ra- *872 diographically there appears to be forward rotary subluxation of the aforementioned vertebrae and without film studies of the neck prior to this injury, it can only be concluded that these are the result of the injury and the fact that there has been no change in the degree of subluxation from the first examination to the present lead the examiner to conclude that the body repair has* been effected in a rather stable fashion. While the patient may have some minor degree of complaints, the writer does not feel that his pain is incapacitating. On the basis of two examinations the writer would be hard put to explain the inability to do anything of a gainful nature.”
On both occasions of the April and June examinations this doctor was of the opinion that there was nothing which would have prevented the plaintiff from doing work as a carpenter’s helper and farming on a small scale. When the doctor examined the plaintiff on November 12, 1958 he was of the opinion that the plaintiff was restricting his motions voluntarily. He re-examined the X-ray series and stated that if there ever had been a fracture (and he was not particularly impressed that one ever had existed) it had healed. In his opinion, there was nothing the matter with the bony make-up of the plaintiff other than the so-called subluxation which was identical to that of a year ago. He stated that on the occasion of his first examination he found no limitation of motion to the plaintiff’s neck and that while he did find some such limitation on the last examination he felt it was voluntary. His final opinion was that the plaintiff could carry on his •occupation as a small farmer and carpenter’s helper and that while he might have some pain factor, he could certainly do a perfectly good job.
From the above and foregoing it is quite evident that the plaintiff suffered a whiplash injury which disabled him for a period of time, but that he is capable of performing the activities of a carpenter’s helper or farmer at present. The exact length of his disability is not made clear; however, the trial judge, in resolving the question of loss of damages held as follows:
“Plaintiff's income for the year 1955, was $1,246.90 of which $1,019.55 was earned as an employee of three different employers, and $227.35, from farming operations. In 1956, plaintiff earned $1,128.00, from three different employments and $241.70, from farming operations or a total income of $1,369.70. In 1957, the income of plaintiff amount to $967.00, of which $732.-55, represented wages which he earned while working with Horace B. Rickey, Inc. from March 20, 1957, until the date of the accident resulting in the personal injuries which incapacitated him to work until approximately October, 1958. (See Income Tax Returns offered in evidence). I calculate that plaintiff’s average monthly income for the years 1955 and 1956 was $109.00. Plaintiff worked approximately 15 weeks from March 13, 1957, until June 24, 1957, for Horace B. Rickey, Inc., and earned during that period approximately $732.00, or a little over $192.00, per month. (Tr., 57-52). In other words, in the year 1957, plaintiff earned approximately $50.00 per week, while working for Horace B. Rickey, Inc., whereas he earned approximately $40.00 per week, during the year, 1956, while he was working for the same firm. However, according to the pattern cut out by plaintiff during the years 1955 and 1956, it is doubtful that he would have worked more than a few months on jobs where he could earn $50.00 per week. Under these circumstances, it seems fair to me to estimate plaintiff’s average income at $125.00, per month, for the purpose of awarding damages for the loss of wages during his total disability. Accordingly, I will award damages in that respect for sixteen months at $125.00 per month, or a total of $2,000.00.”
*873 We find no manifest error in the above quoted computation and this award will, therefore, be allowed to stand.
The award of $6,000.00 by the District Court for physical pain and suffering and permanent disability is likewise neither manifestly insufficient or excessive and will not be disturbed.
For the reasons assigned the judgment appealed from is affirmed.
Judgment Affirmed.